MATTER OF M/V OCEANIC AMITY

In Fine Proceedings

DET–10/10.129

*Decided by Board November 7, 1969*

(1) Statutory authority exists under sections 254(a) and 252(b) of the Immigration and Nationality Act for the reinspection at a subsequent U.S. port of call of the crew of a vessel sailing coastwise and for revocation of conditional landing privileges previously granted following inspection at first port of call.

(2) Notwithstanding notice to detain and deport was not served on the responsible parties and notice of revocation of landing privileges was not served on the alien involved in accordance with 8 CFR 252, liability to fine lies under section 254(a)(2) of the Act for failure to detain aboard the alien-crewman involved since the record is replete with evidence that the substance of the regulation was fully complied with; further, the bringing of fine under section 254(a)(2) rather than section 254(a)(3) of the Act is not a fatal defect to imposition of fine since the carrier was well aware of the nature of the violation with which it was charged; was adequately apprised of the factual basis for its liability; and had ample opportunity to intelligently protest, which it did.

IN RE: M/V *OCEANIC AMITY*, which arrived at the port of Detroit, Michigan, from foreign, via another United States port, on August 5, 1968. Alien crewman involved: WEI-TAO (DAU) KIANG.

BASIS FOR FINE: Act of 1952—Section 254(a)(2) [8 U.S.C. 1284].

ON BEHALF OF CARRIER: John A. Mundell, Jr., Esquire
3266 Penobscot Building
Detroit, Michigan 48226

This matter involves an administrative penalty of $500, $1,000 mitigated to the extent of $500, which the District Director at Detroit has ordered imposed on the vessel's agent, the International Great Lakes Shipping Co., for failure to detain the above-named Chinese alien crewman aboard the vessel at all times despite the fact that his conditional landing privileges had been withdrawn.

When the case was previously before us on August 7, 1969, by

418

way of an appeal raising only the question of mitigation of the penalty, we found that no change in the District Director's decision was warranted. Now, however, the carrier has moved for reconsideration, challenging here for the first time its basic liability to the fine.

The facts pertinent to this fundamental issue require only brief recitation. The vessel made its first United States port call on this trip at Wilmington, Delaware, where its entire 44-man crew was given shore leave privileges. Since eight of the crew members deserted there, the whole crew was reinspected when the ship arrived at Detroit, coastwise. The result was that all the crewmen, with the exception of the Master, were ordered detained on board at Detroit. Thereafter, however, this crewman succeeded in leaving the ship and making his way ashore in the United States. Eventually, he was apprehended by Service officers in Newark, New Jersey, and was thereafter removed from this country by and at the expense of the parties responsible for the vessel's operation.

Procedurally speaking, the carrier's belated denial of liability to the fine is in direct contradiction of the position initially stated in its Memorandum in Support of Appeal For Further Mitigation Of Immigration Fine, page 6, paragraph 1, "Discussion.", as follows:

> No argument can be extended to deny that the violation occurred and or that a fine was not properly assessed under current laws and regulations.

But more important, from the substantive standpoint there is no merit whatsoever in its claim that there is no legal basis for the fine. Simply stated, the law itself provides the answer to the argument that reinspection of the vessel's crew at Detroit was improper because it had not, in the interim, sailed foreign from Wilmington.

Basically, the requirements of detention in subsections (1) and (2) of section 254(a) of the Immigration and Nationality Act are fundamental adjuncts of the ultimate goal of the statute, to wit: the removal of crewmen as covered by subsection (3) thereof, and inseparable from it. Any doubts which might otherwise exist on this point are completely dispelled by the provisions of section 252(b) which, among other sections of the Act relating to administrative fines, must be read together with section 254(a) thereof so as to produce an harmonious whole. In the portions here pertinent, section 252(b) reads:

> Pursuant to regulations prescribed by the Attorney General, any immigration officer may, in his discretion, if he determines that an alien is not a

419

bona fide crewman, or does not intend to depart on the vessel or aircraft which brought him, revoke the conditional permit to land which is granted such crewman * * *, take such crewman into custody, and require the master or commanding officer of the vessel or aircraft on which the crewman arrived to receive and detain him on board such vessel or aircraft, if practical, and such crewman shall be deported from the United Statets * * *.

Clearly, therefore, there is statutory authority for the reinspection of the crew of this vessel at Detroit, and for the revocation of the conditional landing privileges previously issued them. Practically speaking, the carrier itself appears to concede this point in the antepenultimate paragraph of the present motion, wherein it makes specific reference to 8 CFR 252.2, which was promulgated pursuant to statutory authority and spells out the procedure for revocation of landing permits previously issued.

Unfortunately, however, our inquiry cannot be permitted to end with the establishment of that fact, because of the current claim that the Service was guilty of dereliction of duty in that it did not follow its own procedure for the revocation of the crewmen's permits, as outlined in 8 CFR 252. In this connection, we originally indulged in the presumption of official regularity, which seemed fully warranted in view of the carrier's unequivocal concession of liability, *supra*. Now, however, since the point has been raised, it will be considered and rejected, for the reasons hereinafter discussed which render this case clearly distinguishable from a prior published decision of ours holding, in effect, that the Service is bound to strict compliance with its own regulations, *Matter of M/V "Hellenic Leader,"* 10 I. & N. Dec. 737 (BIA, 1964).

Stripped of surplusage, the asserted procedural failure here was that a notice (Form I-259) to detain and deport the alien crewman was not served on the parties responsible for this vessel's operation, and that a notice of revocation of landing privileges (Form I-99) was not served on the detained crewman involved. The answer, however, is that the record is replete with evidence that the substance of the regulation, which should control over its form, was fully complied with in this instance.

In the first place, the carrier itself sets forth at page 7 of its memorandum in support of its appeal for further mitigation of the immigration fine that it notified the Service regarding the desertions at Wilmington and urged the Service to take steps to prevent the recurrence at Detroit, which leads to no conclusion other than that it desired a reinspection of the crew and withdrawal of their conditional landing privileges. Second, pages 1 and 2 of the carrier's "memorandum" make it abundantly clear

that the parties responsible for the vessel's operation were completely cognizant of what had transpired at Detroit, and had taken steps to detain the crew accordingly. Third, page 2 of the carrier's "memorandum" definitely demonstrates that this crewman's papers were taken from him at Detroit, as were those of all the other crewmen, and given to the Master who, along with the boarding immigration officers, ordered the crewmen to remain on board the ship. Finally, in this connection, we note that while this escapee had his permanent landing permit (Form I–184) in his possession when subsequently apprehended at Newark, he had told the boarding inspector at Detroit that he had lost it in Wilmington, so that its removal from his possession in accordance with the regulations was impossible of performance.

Judicial support for our decision on this point can be found in the case of *Hamburg American Line* v. *United States,* 52 F.2d 463 (S.D. N.Y., 1931). The ruling in that case was that the fact of notice rather than its form controls in situations such as the present one. See also, *Matter of SS "Hornshell,"* 1 I. & N. Dec. 365 (BIA, 1942), and 1 I. & N. Dec. 470 (A.G., 1943). All we can add is that when those cases were decided, as at the present time, the Form I–259 was the generally accepted manner of giving notice; and that it is immaterial that the cited cases involved predecessor legislation (section 20(a), 1924 Act; former 8 U.S.C. 167(a)), for reasons previously outlined in *Matter of SS "Marilena,"* 7 I. & N. Dec. 453 (BIA, 1957), and *Matter of M/V "Arnfinn Stange,"* 8 I. & N. Dec. 639 at 642 (BIA, 1960).

There still remains one technical impediment to the imposition of fine in this case, stemming from the fact that the Notice of Intention to Fine (Form I–79) charges a violation of subsection (2) of section 254(a) of the Immigration and Nationality Act. Ostensibly, the procedure followed in this case in this respect would be in conflict with a ruling by this Board that where an arriving alien crewman is granted a D–1 conditional landing permit, which is later revoked, a fine for failure to deport the crewman must be brought under subsection (3) of the statute, *Matter of M/V "Hellenic Leader,"* 10 I. & N. Dec. 737 (BIA, 1964). Here, however, the record clearly reflects that the carrier was well aware of the nature of the violation with which it was being charged; was adequately apprised of the factual basis for its liability; and had ample opportunity to intelligently protest, which it did. Accordingly, we find that this defect is not fatal.

The question of mitigation of this fine has been thoroughly discussed on three prior occasions, and the reasons for the limitation

in the amount of mitigation have been amply stated. This aspect of the case was not brought into the motion now before us. Further discussion of the point is, therefore, now unnecessary.

In conclusion, the Service should follow to the letter the procedures outlined in its own regulations, particularly in administrative fine cases which are quasi-penal in nature. The only reason we find that the deviation therefrom here is not fatal is that the facts peculiar to this case clearly establish that the carrier is in no position to complain.

**ORDER:** It is ordered that the motion be and the same is hereby denied.