## MATTER OF M/V "FERROL"

### In Fine Proceedings

### SPM-10/2.89

*Decided by Board January 31, 1972*

Liability to fine is incurred under section 254(a) of the Immigration and Nationality Act for failure to detain and deport an alien crewman ordered to remain on board the vessel, where the crewman in question was admitted in transit without visa to proceed to the vessel, joined the vessel as a crewman, and thereafter absconded after having been ordered detained on board.

BASIS FOR FINE: Act of 1952 — Section 254(a)(2) [8 U.S.C. 1284].

In re: M/V "FERROL," which arrived at the port of Toledo, Ohio, from foreign, on June 23, 1971. Alien crewman involved: LUCIANO R. L. ROASCIO

ON BEHALF OF CARRIER:
Thomas A. Clure, Esquire
Suite 700 Torrey Building
Duluth, Minnesota 55802

ON BEHALF OF SERVICE:
Charles Gordon
General Counsel
(Brief filed)

These administrative fine proceedings were instituted on the basis of a charge that the carrier had failed to detain the above-named alien crewman aboard the vessel at all times despite the fact that the Service had refused him conditional landing privileges and ordered him detained on board. The case is before this Board upon certification by the District Director, St. Paul, Minnesota, of his order that the Notice of Intention to Fine be withdrawn and that the proceedings be terminated.

There is no dispute as to the basic facts of this matter. The alien named above arrived by aircraft at the port of Boston, Massachusetts, on June 23, 1971. At the time of his arrival, a Form I-95A, Crewman's Landing Permit, was given to him bearing the notation "Detained on board, adm. in transit to M/V Ferrol T.R.W.O.V." The alien proceeded in transit to the M/V "Ferrol" which had arrived at Toledo, Ohio, on the same date. When he arrived at the vessel, a Form I-410, Receipt for Crew List, was executed showing that Roascio, Luciano, cook, arrived in Toledo TRWOV, was ordered detained on board the vessel. The Form I-410 bore a stamped "Notice" that the crewmen listed on the Form under "Detentions" were "to remain on board the vessel at all U.S.

18

ports on this voyage" and that failure to detain on board would result in fine proceedings.

The vessel proceeded from Toledo, Ohio, to Duluth, Minnesota, where the Form I-410 was stamped, "Received June 25, 1971 Immigration and Naturalization Service, Duluth, Minnesota." There is a hand-written notation on the form that the alien was on board on June 29, 1971, but was not on board on June 30, 1971. A report of an immigrant inspector at Duluth, Minnesota, shows that the vessel was boarded on June 30, 1971, after a phone call from the ship's agent that Roascio and two other crewmen were missing.

An affidavit by the vessel's Master confirms that while in Toledo, Ohio, notice was received that the ship's cook had to leave and return to his native Italy; and on June 23, 1971, Roascio was placed on the vessel by the ship's agent in Italy to replace the departed cook; that since Roascio was without a visa, the Master was informed that Roascio was not to leave the vessel, and both the immigration officer and the ship's officer told Roascio that he could not leave the ship. Crewmen were placed on guard on the dock, both at Toledo and Duluth; and upon arrival of the vessel at Duluth, an immigration officer told him (the Master) to keep Roascio on board the vessel. No one, however, told him to hire a private guard.

Roascio and two other crewmen were last seen on board the vessel at 11:30 p.m. on June 29, 1971. They are believed to have left the ship when the first guard awoke the second guard to replace him at midnight. Thereafter, the Master cooperated with immigration officers, furnishing them information he had available as to Roascio's possible whereabouts and his seaman's book.

The officer-in-charge, Duluth, Minnesota, recommended that a fine in the sum of $1,000 be imposed and that no mitigation be allowed. His proposed order notes a possible question as to whether section 254(a) of the Immigration and Nationality Act contemplates only alien crewmen who are on board the vessel at the time of its arrival in the United States, or whether it also embraces alien crewmen who join the ship thereafter. He resolves the issue by the following reasoning.

Section 254(a) directs an agent or Master, among others, of a vessel arriving in the United States, to detain an alien crewman on board after inspection, unless a conditional permit to land temporarily has been granted under section 252 of the Act, under penalty of $1,000 fine for each alien crewman as to whom there is a failure of detention. The language "arriving in the United States from any place outside thereof" primarily differentiates between vessels in foreign trade and those engaged solely in coastwise or

19

intra-United States trade. Liability under section 254(a)(2) has been upheld without exception in cases where the violation occurred after the vessel had "arrived" and had sailed coastwise to other ports. *Matter of M/V "Oceanic Amity"*, 13 I. & N. Dec. 418 (BIA, 1969), affirms the statutory right ro reinspect at subsequent ports of arrival. Part (3) of section 254(a) imposes a penalty for failure to deport an alien crewman whether that requirement is imposed "before or after the crewman is permitted to land temporarily." In the view of the officer-in-charge, the conclusion is inescapable that the words "arriving in the United States," preceding both parts (2) and (3) of section 254(a), must have wider application than to the point of time of the vessel's first arrival in the United States. The M/V "Ferrol" was, therefore, an "arriving" vessel, and subject to section 254(a) requirements. Since Roascio was a crewman under a detention order at the time he absconded, there was liability to fine under section 254(a)(2).

The District Director at St. Paul, Minnesota, has disapproved the recommendation of the officer-in-charge at Duluth. He has concluded that there is statutory authority to reinspect only a nonimmigrant crewman. It is his view that, while a nonimmigrant may have his classification changed in the United States under the procedure set forth in section 248 of the Act (8 U.S.C. 1258), this is not permitted under section 238(d) of the Act (8 U.S.C. 1228) to one admitted under the transit without visa privileges. Accordingly, he concluded that the action taken on June 23, 1971, at Toledo, Ohio, "changing" the alien's nonimmigrant classification to that of a nonimmigrant crewman under paragraph 15(D) of section 101(a), 8 U.S.C. 1101, was contrary to the Act and without force. Since he could not be given a change of classification to that of a nonimmigrant crewman, the District Director found that there was no statutory authority to order him detained on board pursuant to section 252 of the Immigration and Nationality Act (8 U.S.C. 1282). Hence, he found that liability to a fine under section 254 of the Act had not been incurred.

The District Director's order points out that he has at least one other fine proceeding pending, involving the same factual situation, except that the reinspection occurred at a port of entry in another district. The District Director also points out that his decision contermands procedures followed in at least two other districts of the Service. He has, therefore, certified the case to this Board for review.[1]

---

[1] The General Counsel has pointed out in his brief that the District Director's decision actually countermands existing Service-wide procedures.

The issue presented is whether liability to an administrative fine under section 254(a) of the Immigration and Nationality Act is incurred for failure to detain and deport an alien crewman ordered to remain aboard a vessel, where the crewman in question was admitted in transit without visa to proceed to the vessel, joined the vessel as a crewman, and thereafter absconded after having been ordered detained on board. As indicated in the brief submitted by the General Counsel, Immigration and Naturalization Service, the problem thus presented is a novel one.

The General Counsel has asked this Board to take administrative notice of the fact that alien crewmen are frequently admitted, usually in an emergent situation, to replace the loss of a crewman on a vessel in the United States, in the manner that took place in this instance. From time to time in the past, such cases have arrived at the Board, but the sole issue raised has been that of mitigation. We have also had cases presented in such situations where the question has been whether an air carrier has incurred liability to a fine under section 273(a) of the Act (8 U.S.C. 1323), for bringing to the United States without visas passengers who were in fact crewmen destined to a specific vessel in this country, but the issue in those cases was solely whether or not the carrier bringing them to the United States was party to an agreement under section 238 of the Immigration and Nationality Act and whether the aliens involved were presented as being brought therunder.

In this case, Roascio was a crewman by occupation. On arrival at Boston, he was admitted in transit for the sole purpose of pursuing his calling as a crewman by proceeding directly to the M/V "Ferrol." The document reflecting that arrival was the document that the Service uses for crewmen, a Form I-95A "Crewman Landing Permit." When Roascio arrived at Toledo, Ohio, and joined his vessel, the purpose of his transit without visa admission was fulfilled. The document given him at Boston no longer had any meaning or validity. It was a nullity. Roascio no longer had any TRWOV status to be "changed" to some other status.

Toledo is a designated port of entry for all aliens, 8 CFR 100.4(c)(2) (District 24). At Toledo, Roascio was subjected to immigration inspection. It was found that he was a crewman, but that he had no crewman visa or other documents. It was determined that he would be allowed to pursue his duties as a crewman on board the vessel, but would not be permitted to go ashore. There is no doubt that he was a member of the crew from that time on. He was added to the crew list, as reflected by the Form I-410, the affidavit of the Master, and from the appearance of his name on the crew list submitted at the time of the departure of the vessel

from Duluth on June 2, 1971. The Master was fully on notice of the alien's status as a crewman who must be detained on board and of the liability to a fine for failure to detain him.

When Roascio submitted himself to the immigrant inspector at Toledo, he was seeking a new admission to the United States just as surely as if he had proceeded into Canada or some other country and thereafter sought reentry on the M/V "Ferrol." The immigrant inspector found, as had a previous inspector at Boston, that he could not be permitted to land for lack of proper documentation. As is customary, he was permitted to remain on board his vessel, without landing privileges. Yet in doing this the Service was hardly continuing his transit without visa privileges, which had already been fulfilled, nor was it according him any other status than that precisely delineated in the notice to the carrier.

It does not seem reasonable that the United States should be disadvantaged in its administration of the laws governing the control of alien crewmen, because it recognizes the possibility that emergent situations may require replacement of a crewman on a vessel in United States waters. Clearly, the carrier involved in this case was not prejudiced by the procedure followed. On the contrary, not only was Roascio permitted to proceed from Boston, Massachusetts, to Toledo, Ohio, without any immigration documents, and join the vessel, but the carrier was fully and immediately put upon notice that Roascio had been inspected as a member of the crew at Toledo, Ohio, and that he lacked documents and could not be admitted. Indeed, the affidavit of the Master, and even the brief submitted in support of the carrier's notice of protest to imposition of the fine, reveal complete awareness of this fact.

Conceivably, the Service could have said to Roascio at Boston, Massachusetts, "You cannot be admitted here, but you can go to Canada and from there proceed to Toledo and seek entry on your vessel." This would have avoided the issue and arrived at the same result. Yet this would have been a narrow aproach to the law, meriting criticism of Service action as unresponsive to the needs of the carrier.

In summary, it is the Service position that when Roascio completed his transit and arrived at Toledo, the moment he stepped on board the M/V "Ferrol," his transit privileges were completed in all aspects. He no longer had any transit without visa status "to be changed" into some other ninimmigrant status. He had no immigration status whatsoever at that hypothetical point in time. What took place thereafter was a new application for admission as a crewman at the port of entry into the United

22

States, just as surely as if his transit had taken him across the border into Canada.

A somewhat analogous situation exists where an alien enters the United States in transit in pursuit of his calling as a crewman to join a vessel in the United States, but after entry abandons his calling as a crewman and later seeks adjustment of status under section 245 of the Immigration and Nationality Act, a relief barred to one who entered as a crewman. This Board has consistently held that since it was the intent of Congress to bar from adjustment all occupational crewmen who entered by reason of their occupation, the significant question is whether the alien entered in pursuit of that calling. The technical recording of entry in transit has not been permitted to defeat the intent of the statute, *Matter of Goncalves*, 10 I. & N. Dec. 277 (BIA, 1963); and *Matter of Tzimas*, 10 I. & N. Dec. 101 (BIA, 1962). By analogy, the fact that Roascio was permitted to transit the United States without a visa in pursuit of his calling as a crewman should not be permitted to defeat the Congressional intent for a rigid control of crewmen entries, and liability for a fine where an alien, occupationally a crewman, is allowed to debark in violation of the law.

In the light of the foregoing, we agree with the General Counsel that the District Director's order was incorrect and that liability to a fine has been incurred in this instance. However, as the General Counsel has noted, because of the District Director's order terminating proceedings he has not ruled on the recommendation that there be no mitigation of the fine. We will, accordingly, remand the case for consideration by the District Director of this aspect of the matter.

**ORDER:** It is ordered that the District Director's decision of August 31, 1971, be withdrawn and that the matter be remanded to that official for appropriate action not inconsistent with the foregoing opinion.